# IN THE COURT OF APPEALS OF IOWA

No. 20-1126
Filed December 16, 2020

**IN THE INTEREST OF B.F.,**
**Minor Child,**

**J.F., Father,**
        Appellant.

_____

Appeal from the Iowa District Court for Hancock County, Karen Kaufman Salic, District Associate Judge.

A father appeals the termination of parental rights to his child.  **REVERSED AND REMANDED.**

Crystal L. Ely of North Iowa Youth Law Center, Mason City, for appellant father.

Thomas J. Miller, Attorney General, and Ellen Ramsey-Kacena, Assistant Attorney General, for appellee State.

Carrie J. Rodriguez, Garner, attorney and guardian ad litem for minor child.

Considered by Doyle, P.J., Tabor, J., and Blane, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2020).

**BLANE, Senior Judge.**

J.F., the father of B.F., his eight-year-old daughter, appeals the termination of his parental rights.[1]  The juvenile court found the State proved by clear and convincing evidence that J.F.'s rights should be terminated under Iowa Code section 232.116(1)(e) and (f) (2020).  Upon our de novo review, we find the State failed in its proof and the father's rights should not have been terminated by the juvenile court.[2]

I. Standard of review.

Our review is de novo.  *In re L.T.*, 924 N.W.2d 521, 526 (Iowa 2019).  Our primary consideration is the best interests of the child, *In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006), the defining elements of which are the child's safety and need for a permanent home.  *In re H.S.*, 805 N.W.2d 737, 748 (Iowa 2011).  Appellate courts are "not bound by the juvenile court's findings of fact, but [we] do give them weight, especially in assessing the credibility of witnesses."  *In re A.M.*, 843 N.W.2d 100, 110 (Iowa 2014) (quoting *In re D.W.*, 791 N.W.2d 703, 106 (Iowa 2010)).  The appellate court "will uphold an order terminating parental rights if there is clear and convincing evidence" of a ground for termination under Iowa Code section 232.116(1).  *D.W.*, 791 N.W.2d at 706.

II. Factual and procedural background.

In October 2011, B.F. was born to J.F. and A.D. (mother), her unwed parents.  Following B.F.'s birth, the parents went separate ways but shared

---

[1] All ages are at the time of the termination hearing.
[2] The mother also appealed the termination of her parental rights to the child, as well as another of her children.  Her appeal was dismissed by the supreme court for failure to timely file her petition on appeal.

physical care. J.F. later married M.F., who had a five-year-old son by a previous relationship. J.F. and M.F. also have a three-year-old daughter together and were expecting another child at the time of the termination hearing. They initially resided in Forest City.

A.D. married J.D. and together they have two children, L.D. born in June 2016, and R.D. born in June 2019. At birth, L.D. tested positive for methamphetamine, which brought A.D. to the attention of the Department of Human Services (DHS).[3] On October 21, 2017, following execution of a search warrant on A.D. and J.D.'s residence where methamphetamine, marijuana, and drug paraphernalia were found, DHS intervened and removed both L.D. and B.F. A.D. admitted she had relapsed on methamphetamine and J.D. was using. B.F. was placed with her father, J.F.

On December 8, 2017, B.F. was adjudicated a child in need of assistance (CINA). In the CINA adjudication order, the court noted A.D.'s concerns regarding J.F.'s alcohol abuse and recent operating-while-intoxicated conviction, but stated: "No current concerns have been observed." The order provided: "Parents and all household members shall abstain from the use of any illegal substance, abstain from the abuse of any substance, and submit to alcohol or drug testing as directed by the Department or treatment provider." The only specific reference to J.F. was that he "complete the [department of transportation] course for his license within the next 60 days." In January 2018, after A.D. began drug treatment, the children were returned to her care, and B.F. again split time between A.D. and J.F.

---

[3] In another proceeding, A.D. and J.D.'s parental rights as to L.D. were terminated.

In April 2018, A.D. and J.D. were involved in episodes of domestic abuse, some viewed by the children. Both L.D. and B.F. were again removed on May 3, with B.F. again being placed with J.F. At a hearing on May 11, J.F. was ordered to submit to drug testing and he admitted he would be positive for marijuana. J.F. stated he had run out of his anxiety medication and used marijuana as a substitute. Based on this admission, the court ordered B.F. removed and placed with the paternal grandparents. J.F. responded by taking initiative, being drug tested at Prairie Ridge, and restarting his anxiety medication. J.F. was diagnosed with marijuana use disorder (moderate—frequency of one to three times in past month) and alcohol use disorder (mild—daily). B.F. was returned to J.F.'s care on May 25.

Once B.F. was returned to his care, J.F. again became resistive to DHS's involvement. Over the next month, he refused further drug testing, stopped taking his medication, and did not have B.F. begin her recommended counseling. J.F. had reported that Prairie Ridge did not recommend he receive any additional treatment, but DHS learned that Prairie Ridge had recommended "individual counseling," which J.F. had not started. B.F. was removed from J.F.'s care and returned to her grandparents' care on July 10, where she remained at the time of the termination hearing in August 2020. J.F.'s visits were to be supervised by his parents, which were effectively unlimited and without restriction.

In August, a hair-stat drug test was performed on B.F., which was negative for all substances, indicating she was not exposed to substances for the prior ninety days. By the time of the review hearing in August, J.F. had provided a drug test to DHS that was negative for all substances. The court declined to return B.F.

to J.F.'s care despite the negative test due to his continued resistance to working with both DHS and family safety, risk, and permanency (FSRP) providers.

In spring 2019, J.F. obtained a new job with a welding company in Thompson, Iowa. He works away from home for up to ten days, and then returns home with four days off. J.F. and M.F. purchased a home in Thompson, Iowa, which was further away from his parents and curtailed his ability to visit B.F. as often. In April 2019, J.F.'s hair test was positive for marijuana, and J.F. agreed to attend drug treatment at Prairie Ridge. M.F. also tested positive for marijuana, and she underwent treatment at Prairie Ridge. Despite both parents' positive drug tests, DHS did not recommend removal of the two children from their home. In April, B.F. complained to the FSRP worker that J.F. only seemed to visit her in person when he had something to pick up or to do at his parents' home. In May, J.F. was working better with FSRP and meeting more regularly with the provider. His work schedule made it hard to comply with services, but he was more consistent with visiting B.F. and using video conferencing to stay in contact with her while working long distances from her.

Over the next year, J.F. continued to maintain contact with B.F., with video conferencing becoming the primary form in March 2020 due to the COVID-19 pandemic. The DHS report on May 27 stated that J.F. had been off work for a period of time due to the pandemic and was respectful of not showing up in person for visits with B.F. as a result. Also, according to that DHS report, J.F.'s cooperation with DHS and FSRP declined, which indicated he was not motivated to work toward reunification. However, those same reports support that J.F.'s visits with B.F. were going well and that B.F. looked forward to and enjoyed seeing her

father. In May 2020, DHS again requested J.F. undergo drug testing, which he did not complete. J.F. and M.F. were expecting the birth of another child, and B.F. was excited about the baby. The DHS's June 13 report advised "the Covid situation had required face-to-face visits to stop but video calls continued." In the DHS's updated report filed on July 13, J.F. stated his desire to retain his parental rights.

On May 7, 2020, the State filed its petition to terminate parental rights.[4] The petition sought to terminate J.F.'s rights based on Iowa Code section 232.116(1)(e) and (f) (2020). The juvenile court held the termination hearing on August 14, 2020.[5] The State offered the testimony of Wendy Moore from DHS and exhibits consisting of FSRP reports as well as reports from Prairie Ridge as to drug evaluations. According to Moore, DHS never had any safety concerns regarding B.F. being in J.F.'s care. She testified that DHS could not determine whether J.F. could safely parent because of unknown marijuana usage. DHS concluded that B.F. was bonded with her father and that J.F. had maintained contact with B.F., testifying that contact was significant and meaningful. According to Moore, B.F. enjoyed all the time she had with her father and loved spending time with him.

J.F. testified on his own behalf. He acknowledged his marijuana use but denied ever doing so around B.F. or that it interfered with his parenting. He

---

[4] The petition sought to terminate the parental rights of A.D. and J.D. to their child, R.D., as well as terminate the parental rights of J.F. and A.D. to their child, B.F. Following the hearing, the juvenile court granted the petition and terminated the parental rights.

[5] Upon our review of the record, we note that the vast majority of the evidence and the juvenile court's ruling dealt with the termination of A.D.'s and J.D.'s parental rights as to R.D.

objected to the termination of his parental rights and, if B.F. was not returned to his care, he felt the best alternative was to place B.F. under a guardianship with his parents. On August 18, 2020, the juvenile court filed its ruling, granting the State's petition and terminating J.F.'s parental rights as to B.F. J.F. appeals.

III. Discussion.

In determining whether parental rights should be terminated, the court is required to utilize the three-part analysis established by the Iowa Supreme Court in *In re P.L.*, 778 N.W.2d 33, 37 (Iowa 2010):

> [T]he proper analysis under section 232 is first for the court to determine if a ground for termination exists under section 232.116(1). If a ground exists, the court may terminate a parent's parental rights. In considering whether to terminate, "the court shall give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Any findings in this regard should be contained in the judge's decision. Finally, before terminating a parent's parental rights, the court must consider if any of the exceptions contained in Iowa Code section 232.116(3) allow the court not to terminate.

(Citations omitted.) On de novo review, we apply the same analysis.

A. Section 232.116(1)(e).

We will affirm termination of J.F's parental rights if the State proved by clear and convincing evidence the statutory requirements in Iowa Code section 232.116(1)(e) or (f). Paragraph (e) requires the State to prove: (1) the child has been adjudicated a child in need of assistance pursuant to section 232.96; (2) the child has been removed from the physical custody of the child's parents for a period of at least six consecutive months; and (3) there is clear and convincing evidence that the parent has not maintained significant and meaningful contact with the child

during the previous six consecutive months and has made no reasonable efforts to resume care of the child despite being given the opportunity to do so.[6]

J.F. challenges only element three, whether there was clear and convincing evidence that he had not maintained significant and meaningful contact with B.F. during the previous six consecutive months. The juvenile court's termination order found: J.F. "had increased his video contact with [B.F.]." At another point in the ruling, the juvenile court stated:

> [B.F.]'s father is expecting another child with his wife. He is gone for the week for work and has made efforts to increase his calls with [B.F.]. She very much enjoys these. Even at this late date—and almost three years into this case—he has not obtained an updated substance abuse evaluation, completed any treatment recommendations and will not submit to drug testing. He only recently signed a release for [FSRP] to speak directly to his wife about [B.F.]

Later in the ruling, the court stated:

> [B.F.] also feels connected to [J.F.]'s child with [M.F.] and [M.F.]'s other child, as she will with their new baby, but she is consistently denied an active role in their family. Even in [J.F.]'s testimony at the termination hearing he referred to his "family" as [M.F.] and their children, not [B.F.]. Thankfully, [B.F.] did not have to hear him actually say that, but she undoubtedly feels that sentiment in the disproportionate contact he has with his "family" compared to her. As [the] guardian ad litem report highlights, [B.F.] associates her father's personal appearance in her life as a duty he fulfills when he mows his parents' lawn.

---

[6] For the purposes of this subparagraph,

"significant and meaningful contact" includes but is not limited to the affirmative assumption by the parents of the duties encompassed by the role of being a parent. This affirmative duty, in addition to financial obligations, requires continued interest in the child, a genuine effort to complete the responsibilities prescribed in the case permanency plan, a genuine effort to maintain communication with the child, and requires that the parents establish and maintain a place of importance in the child's life.

Iowa Code § 232.116(1)(e)(3).

We note this observation by the guardian ad litem was in April 2019, sixteen months before the termination hearing. At the same time B.F. expressed her frustration, she also voiced her desire to return to the care of her parents. FSRP written reports since that observation indicated B.F. was consistently excited to see her father and enjoyed their visits together. The juvenile court concluded:

> [J.F.] argues that his contact with [B.F.] over the past six months has been significant and meaningful. Certainly, [B.F.] finds contact with her father meaningful. She has asked to see him often and enjoys their time together. He seems to have increased the frequency of video contact with her over the last several months, but even with social distancing, in person visits during his hiatus from his usual work schedule have not been plentiful. He also seems to often bring his other children and wife to those visits and repeatedly cited only one instances where he, [B.F.] and his father went fishing alone. Ms. Moore discussed a birthday party [B.F.] attended for [J.F.]'s stepson that [Moore] stumbled across in the community. Again, there is no doubt that any contact she has had with [J.F.] means a great deal to [B.F.]. However, "significant and meaningful contact" is a term of art with a specific legal definition under chapter 232. It includes, but is not limited to "the affirmative assumption of the duties encompassed by the role of being a parent. This affirmative duty, in addition to financial obligations, requires continued interest, a genuine effort to complete the responsibilities prescribed in the case permanency plan, a genuine effort to maintain communication, and establishing and maintaining a place of importance in the child's life." [J.F.] has done nothing to advance the responsibilities prescribed in the case plan. For three years he has refused to submit to almost all drug testing and his last known test seems to have been in April 2019 in connection with a child abuse assessment for his other children, which was positive for marijuana. He has refused to follow through with any recommendations for substance abuse treatment. He has failed to establish a regular visitation schedule with B.F. There is no evidence that he has provided anything for her financially. He has scheduled one visit with B.F. to be supervised by FSRP/FCS and not taken advantage of the very liberal and convenient opportunity to see B.F. basically any time he wants at his parents' home. There is no evidence that he has undertaken an affirmative act of parenting for B.F. throughout the long pendency of her CINA case—no identified interactions with the school, doctors, counselor, attendance at school events or activities for B.F., preparation of a meal, etc. He has made some effort to incorporate B.F. into his family by inviting her to a birthday party for her step-sibling and bringing them to visits, but she

largely appears (and very much feels herself) to be an afterthought and obligation.

The juvenile court focused on the statutory definition of "significant and meaningful contact." Under de novo review, we review both the facts and the law, and adjudicate rights anew. *In re T.A.L.*, 505 N.W.2d 480, 482 (Iowa 1993). On our review, we do not agree that there is clear and convincing evidence supporting termination of J.F.'s parental rights under this paragraph.

We note that when B.F. was adjudicated CINA in December 2017, it was solely based at that time on her mother's methamphetamine use.[7] J.F. complained throughout the proceedings that B.F. was involved in the juvenile court because of her mother's methamphetamine use and DHS should not be requiring his involvement. Our court has held:

> Inherent in CINA proceedings is a requirement that parents who were the cause of the CINA determination are required to take certain affirmative steps to remedy the circumstances which gave rise to the adjudication. In other words, maintaining the status quo is not sufficient for such a parent. In the event only one of the parents was responsible for causing the CINA adjudication, the other parent cannot refuse to assist in the remediation and just stand on the sideline and observe. That is the directive the legislature requires under section 232.116(1)(e)(3).

*In re T.S.*, 868 N.W.2d 425, 442 (Iowa Ct. App. 2015), *as amended* (Oct. 16, 2015). J.F. was obligated to assist in eliminating the basis for the CINA.

In reviewing the juvenile court ruling, the first criticism regarding J.F. is that his personal visits have not been plentiful and that J.F. has failed to establish a regular visitation schedule with B.F. The termination hearing was held in August.

---

[7] In an order regarding temporary removal, the court indicated a CINA petition should be filed as to J.F. We can find no such filing in this appellate record.

The COVID-19 restrictions commenced in mid-March, five months earlier. DHS reports indicated the agency recommended limiting in-person visits. Under these circumstances, we cannot find fault with J.F.'s limited personal contact with his daughter. No set visitation schedule was ever imposed. B.F. resided with her grandparents, and J.F. could visit B.F. at his parents' home without restrictions.

Since the spring of 2019, J.F. has been employed full time as a welder, but he is required to travel to worksites away from home for up to ten days at a time. Various DHS reports and court orders indicate this employment interferes with J.F.'s ability to establish an in-person visit schedule, or even to attend court hearings. Yet, in those reports and orders, DHS and the court have emphasized the need for J.F. to maintain this employment so he is able to financially provide for his family, including B.F. To compensate for his work travel, J.F. was complimented by the DHS and FSRP workers when he made sure B.F. had a computer tablet so he could video chat with her from his work locations.

The juvenile court also criticized that when J.F. did visit B.F., he would also bring his other children and his wife. We see nothing detrimental. According to numerous FSRP reports, B.F. enjoys her contact with her step-mother, step-brother, and half-sister. B.F. was also excited about the new baby that was expected. Since the initial permanency plan was to reunite the family, it only makes sense for all these potential family members to interact and become more familiar with each other. Later, the court appears to contradict this criticism when it finds J.F.: "has made some effort to incorporate B.F. into his family by inviting her to a birthday party for her step-sibling and bringing them to visits."

The termination order also asserts that there is no evidence that J.F. has provided anything for B.F. financially. First, lest we forget, the burden of proof here is with the State, not J.F. If there is no evidence, there cannot be a presumption against J.F. In addition, there is no evidence in the record that a child-support order was in effect between J.F. and A.D. They shared split care of B.F., and it does not appear either one paid child support to the other. J.F. obviously provided for B.F. while she lived with him and M.F. until she was removed and placed with his parents. We find no order in the record that required J.F. to provide support for B.F. to his parents. The State could have certainly made inquiry to J.F.'s parents to see if they had received financial support for B.F. from J.F. and whether they had requested any.

Next, the juvenile court found there is no evidence that J.F. has undertaken an affirmative act of parenting B.F. "throughout the long pendency of her CINA case." This finding may be true for the last six months, but not during the "long pendency of the CINA." B.F. was placed for months at a time with J.F. and M.F., during which he performed affirmative acts of parenting. Our review of the trial evidence and exhibits does not reveal evidence one way or the other as to J.F.'s participation in the types of activities referred to by the court in its termination order. During the "previous six consecutive months" before the termination hearing, *see* Iowa Code § 232.116(e)(3), J.F.'s employment interfered with his ability to engage in parenting and, especially when combined with the pandemic and its restrictions, has not permitted him to interact with or attend school events, conferences, doctor visits, or similar activities in person; at best, such activities have been held by video conference.

The termination order points to the requirement that the parents must make "a genuine effort to complete the responsibilities prescribed in the case permanency plan." We find what is called a "care plan goal" in the FSRP reports, and in various DHS reports to the court a list of what DHS "respectfully recommends," but no document in the record is identifiable as a case permanency plan.[8] The care plan goal was for B.F. to live in a safe and stable home environment with parents who are free from substances *which would negatively affect their ability to provide for her safety and care* and that B.F. will have a safe, alert, and appropriate care giver at all times. To accomplish this, there were two service plan objectives set out: (1) A.D. and J.F. will demonstrate they are clean and sober while caring for their children by drug testing results and team members' observations and (2) A.D. and J.F. will provide a home free of illegal substances.

In the termination order, the juvenile court pointedly identified J.F.'s failures as to a permanency plan: that he has refused to submit to almost all drug testing— the last known test being in April 2019, which was positive for marijuana— and that he has refused to follow through with any recommendations for substance-abuse treatment. As we pointed out above, drug testing and evaluation identified

---

[8] These requirements changed in the various DHS reports. In its June 12, 2020 DHS report to the court, the last to address reunification, out of sixteen recommendations, only four requirements related to J.F.: (1) to provide documentation of substance-abuse treatment and/or written recommendations for service involvement; (2) sign requested releases; (3) maintain employment and appropriate housing for themselves and their children; and (4) inform DHS of any changes in housing, employment, or household composition within three working days.

"We should not terminate a parent's rights on the ground the parent failed to comply with the 'case permanency plan,' which is a statutorily defined term, *see* Iowa Code § 232.2(4), when we cannot find the 'case permanency plan' in the record." *In re T.S.,* 868 N.W.2d at 446 (McDonald, J., dissenting).

moderate use of marijuana as the only illegal substance which would negatively affect J.F.s ability to provide for B.F.'s safety and care.

The issue is whether J.F.'s marijuana use, failure to comply with requested drug testing, and failure to follow treatment recommendations constitute clear and convincing evidence sufficient to terminate his parental rights. We find two of our prior opinions instructive. In *In re M.S.*, as here, the juvenile court terminated the father's parental rights due to his continued use of marijuana. 889 N.W.2d 675, 681 (Iowa Ct. App. 2016). In reversing the termination, we held:

> The State and dissent also contend [the father] testing positive for cannabis in contravention of the case plan is sufficient evidence to support the termination of his parental rights. The failure to comply with the case plan is not enough. The authority to terminate a parent's rights is wholly a creature of statute. The legislature has enacted a comprehensive scheme specifying the exclusive grounds upon which the State can seek to terminate a parent's rights. Absent from this comprehensive scheme is the authority to terminate a parent's rights for mere failure to comply with IDHS's case plan. The fact the legislature has not included this ground within this exclusive statutory scheme establishes the failure to comply with the case plan, standing alone, is not sufficient grounds to justify the termination of parental rights. Indeed, the termination of parental rights because of a parent's failure to follow the case plan, without a showing of harm, would run afoul of due process.

*Id.* (citations omitted). We went on to state:

> Even assuming the test results could be interpreted as the dissent suggests, the mere fact of use does not establish adjudicatory harm. *Cf.* Iowa Code § 232.2(6)(n) (listing as adjudicatory harm a parent's "drug or alcohol abuse [that] *results in the child not receiving adequate care* " (emphasis added)); Iowa Code § 232.116(1)(*l*) (requiring proof of harm to self or others); *see In re J.S.*, 846 N.W.2d 36, 42 (Iowa 2014) (holding mother's use of methamphetamine, in and of itself, did not constitute adjudicatory harm); *In re J.W.*, No. 14-0515, 2014 WL 3749419, at *3 (Iowa Ct. App. July 30, 2014) (holding the mother's status as a prior substance abuser did not necessarily establish adjudicatory harm); *In re L.R.*, No. 09-1544, 2010 WL 200817, at *7 (Iowa Ct. App. Jan. 22, 2010) (reversing termination

order where State failed to establish nexus between parent's alcohol abuse and risk of adjudicatory harm to the child).

Instead, the State must establish a nexus between the father's cannabis use and an appreciable risk of adjudicatory harm to the child within the meaning of section 232.102.

*Id.* at 682. In a more recent case, we reiterated:

[The father] argues that his continuing use of methamphetamine does not mean O.P. cannot be returned to his care. The father cites *M.S.* in support of his claim. 889 N.W.2d at 682. But that case required the State to establish a nexus between the parent's use of cannabis and an appreciable risk of adjudicatory harm. *Id.* Our case law distinguishes between use of cannabis and addictions to methamphetamine. *See, e.g.*, *In re J.S.*, 846 N.W.2d 36, 42 (Iowa 2014) ("[A] juvenile court could reasonably determine that a parent's active addiction to methamphetamine is 'imminently likely' to result in harmful effects to the physical, mental, or social wellbeing of the child[ ] in the parent's care.").

*In re O.P.*, No. 20-0995, 2020 WL 5946390, at *2 (Iowa Ct. App. Oct. 7, 2020).

J.F. has been continually employed since the spring of 2019. He has maintained consistent contact with B.F. He has been married to M.F. for at least the past four years and they have purchased a home in Thompson, Iowa, suitable to raise a family, including B.F. According to DHS and FSRP reports, the home is safe and livable. During the entire time B.F.'s case has been open, J.F. and M.F. have been raising M.F.'s son and their own child. Despite DHS involvement, the department saw no need to remove these younger children. J.F. denied using marijuana around B.F. and her negative hair-stat tests support this. None of the DHS or FSRP reports contain any information that J.F. was under the influence when interacting with the providers or with B.F. We find the State failed to prove a nexus between J.F.'s marijuana use and an appreciable risk of adjudicatory harm to B.F. to support termination under section 232.116(1)(e).

B. Section 232.116(1)(f).

The juvenile court also found termination appropriate under subsection (f). It provides that a parent's parental rights may be terminated if all of the following have occurred: (1) the child is four years of age or older; (2) the child has been adjudicated a CINA; (3) the child has been removed from the physical custody of the child's parents for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days; and (4) there is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102.

The sole element at issue is the fourth. "At the present time" has been interpreted to mean "at the time of the termination hearing." *D.W.*, 791 N.W.2d at 707. A child cannot be returned to the custody of the parent under section 232.102 if doing so would expose the child to any harm amounting to a new CINA adjudication. *M.S.*, 889 N.W.2d at 680.

Based upon our review discussed above, we find that the State did not establish by clear and convincing evidence that B.F. could not have been returned to the custody of J.F. at the time of the termination hearing. The State presented no evidence that J.F.'s use of marijuana constituted an appreciable risk of adjudicatory harm to the child so as to establish the necessary nexus that would render him an unfit parent. The juvenile court did not have clear and convincing evidence to terminate J.F.'s parental rights under section 232.116(1)(f).

Under *P.L.*, since we have determined J.F.'s parental rights should not have been terminated, there is no need for us to address the remainder of the three-part

analysis. 778 N.W.2d at 37. However, we feel compelled to make this observation. The evidence is clear that J.F. failed to cooperate with DHS and FSRP providers. He also failed to comply with DHS requests and court-imposed obligations regarding participation in drug testing, evaluation, and recommended treatment. It appears that a significant reason for the juvenile court's termination of J.F.'s parental rights was due to his proverbial "thumbing his nose" at the court and the agency and the frustration it created that initiated the termination petition and order. However, this does not reduce the State's burden of proof.

It should be clear, by this opinion we are not condoning J.F.'s lack of cooperation and failure to comply. He did so at significant risk of losing his parental rights. If there had been evidence of a nexus between his substance abuse and inability to care for his daughter, his resistive conduct would have more than justified the termination order by the juvenile court.

IV. Conclusion.

We find the State failed to prove by clear and convincing evidence that J.F.'s parental rights should be terminated under either Iowa Code sections 232.116(1)(e) or (f), and we therefore reverse the juvenile court order terminating parental rights.

**REVERSED AND REMANDED.**